# EXHIBIT B

FILED
CLERK

2:59 pm, Sep 01, 2020

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------

TONY CACCAVALE et al,

                          *Plaintiffs,*

              v.

HEWLETT-PACKARD COMPANY et al,

                          *Defendants.*

--------------------------------------

Docket 20-cv-00974-GRB-AKT

United States Courthouse
Central Islip, New York

July 15, 2020
11:10 a.m. - 11:40 a.m.

TRANSCRIPT FOR CIVIL CAUSE
TELEPHONE PRE-MOTION CONFERENCE
BEFORE THE HONORABLE GARY R. BROWN
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S :

| | |
|---|---|
| *For Plaintiffs:* | STEVEN JOHN MOSER, ESQ. |
| | PAUL ANDREW PAGANO, ESQ. |
| | Moser Law Firm PC |
| | 5 East Main Street |
| | Huntington, New York 11743 |
| | (516) 671-1150; (516) 882.5420 fax |
| | |
| *For HP Inc. and Hewlett Packard Enterprise Company:* | KRISTOFOR T. HENNING, ESQ. |
| | ILANA SARAH LEVIN, ESQ. (NJ Ofc) |
| | McCarter & English LLP |
| | 1600 Market Street, Suite 3900 |
| | Philadelphia, Pennsylvania 19103 |
| | (215) 979-3800; (215) 979-3899 fax |
| | |
| *For Unisys Corporation:* | KENNETH WELCH DIGIA, ESQ. |
| | JEFFREY HOWARD RUZAL, ESQ. |
| | Epstein Becker & Green, P.C. |
| | 875 Third Avenue |
| | New York, New York 10022 |
| | (212) 351-4500; (212) 878-8600 fax |
| | |
| *Transcriber:* | AA EXPRESS TRANSCRIPTS |
| | 195 Willoughby Avenue, Suite 1514 |
| | Brooklyn, New York, 11205 |
| | (888) 456-9716 |
| | aaexpress@court-transcripts.net |

*(Proceedings recorded by electronic sound recording)*

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20     2

1            COURTROOM DEPUTY:  Calling case civil 2020-00974,

2    *Caccavale et al v. Hewlett-Packard Company et al*.  Counsel,

3    please state your appearance for the record.  Plaintiff goes

4    first.

5            MR. MOSER:  Steven Moser, for the Plaintiff.  Good

6    morning, Your Honor.

7            THE COURT:  Good morning, Mr. Moser.

8            MR. PAGANO:  Also, Paul Pagano, for the Plaintiff.

9    Good morning, Your Honor.

10           THE COURT:  All right.  And for Defendants?

11           MR. HENNING:  Your Honor, Kris Henning, from McCarter

12   & English, for Defendant, HP Inc. and Hewlett Packard Enterprise

13   Company.

14           MS. LEVIN:  Good morning, Your Honor, Ilana Levin,

15   also for HP Inc. and Hewlett Packard Enterprise Company.

16           THE COURT:  Is that it?

17           MR. RUZAL:  Good morning, Your Honor. Jeff Ruzal from

18   Epstein Becker & Green, for Defendant, Unisys Corporation.

19           THE COURT:  Okay.

20           MR. DIGIA:  Kenneth Digia, from Epstein Becker &

21   Green.  Also, for Unisys Corporation.

22           THE COURT:  Anyone else?

23           (No response.)

24           THE COURT:  I think that's a sufficient pause to say

25   no.  So, I'll say no on that.  Thank you, everybody.  And I'm

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20        3

1   going to ask, to the extent possible, counsel just designate one

2   speaker, because this is hard.  And let me start out by saying,

3   we're here for a pre-motion conference by Defendants  We are

4   working under very difficult conditions.  It should be noted

5   that the pandemic is still raging across this country, sadly,

6   and we are working under difficult conditions.  This is an audio

7   conference, but I'm sure everyone will do a fine job.

8          I will remind counsel, before we start, that I do

9   reserve the right, it's in my rules, it's also a second circuit

10  approved procedure to deem the pre-motion filing as the filings

11  themselves.  I'm not sure I'm going to do that today, but I do

12  reserve the right to do that to combine that with the arguments

13  made today.  So, feel free to argue anything you want to me

14  today.  I will not preclude any arguments that you might want to

15  make.  So, with that mind, between the Defendants, who would

16  like to go first?

17         MR. HENNING:  Your Honor, this is Kris Henning from

18  McCarter & English, for Defendants, HP Inc. and Hewlett Packard

19  Enterprise Company.  I'm happy to take the first crack at it if

20  that's okay with everyone.

21         THE COURT:  Okay.  That's great.  Let's do that.  And

22  let me just focus you on one issue because having done some

23  review of the pre-motion filing, I'm interested in one of your

24  issues, which is the question of whether state law provides a

25  remedy for the late payment of wages.  That's an interesting

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20      4

1    issue.  So, if you focus your comments on that, I'd be most

2    interested, but I'll let you speak to anything you want.

3    please, go ahead.

4              MR. HENNING:  Absolutely.  Will do, Your Honor.

5    Briefly.  Your Honor, has clearly read the papers and knows that

6    we're here on two claims as to my client, Sections 191 and 198

7    of the Labor Code.  Plaintiffs allege that they are manual

8    workers, who were paid bi-weekly instead of weekly.  And in

9    count two, which is asserted against only Hewlett Packard

10   Enterprise Company ("HPE"), a Section 195 claim of the Labor

11   Code, alleging that HPE failed to provide a sufficient notice,

12   wage notice, at the time at the of hiring.

13             In count one, the Plaintiffs don't allege, Your Honor,

14   that they were paid an insufficient amount of wages, or that

15   they were paid wages that were lower than they were required to

16   receive from any Defendant.  Instead, the claim is, as we said,

17   they were paid bi-weekly instead of weekly, which takes us right

18   to the issue Your Honor asked me to focus on, and so we'll get

19   to it.

20             Section 198 provides a remedy for "underpayment of

21   wages."  We have cited a few cases to Your Honor for the

22   proposition that underpayment is not the same as late payment,

23   and therefore, Section 198 does not provide a remedy or,

24   therefore, a claim for instances in which a Defendant is alleged

25   to have paid the full amount of wages due to the Plaintiff, but

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20     5

1   is alleged to have done so past the deadline Plaintiffs claim

2   against.

3           THE COURT:  Counsel, let me interrupt you for one

4   second.  To say that you cited me some cases, I think you would

5   agree with me, and please correct me if I'm wrong, that among

6   the cases cited there's nothing that would constitute what we

7   refer to as binding authority.  Am I right about that?

8           MR. HENNING:  You are right about that, Your Honor.

9   Nothing from the Second Circuit or the New York Court of Appeals

10  on this particular question.  And as we said in our pre-motion

11  letter to the Court, we acknowledge that the caselaw on this

12  issue is not uniformed.  We gave the Court four cases.  One from

13  the Eastern District of New York, _RCLO_.  Also, cited

14  _Beillevaire_.  And then, two state court cases, _Hunter_ and

15  _Phillips_.  And, Your Honor, there's no need to go through them

16  individually, except to say, _RCLO_, obviously, from the same

17  court in which we're talking to you, all of them stand for the

18  proposition that Section 198 does not provide for a claim for

19  late wages that are fully paid.

20          And the analysis, Your Honor, we think is on point.

21  Under payment, the ordinary usage of the term "underpayment" is

22  to be paid less than an amount required to be paid.  There is a

23  difference in the ordinary usage of the terms between being paid

24  less than an amount required and later than the deadline by

25  which you're supposed to be paid.

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20    6

1        The New York Legislature --

2        THE COURT:  Let me stop you there, counsel.  Let me

3   stop you there.  I think I understand this correctly.  What I'm

4   going to say is not unprecedented.  Meaning it's happened

5   before, but it's sort of an oddity.  It would be your position

6   that in looking at the state labor law in it's entirety, and you

7   just said, wages when they're supposed to be paid, bi-

8   weekly/weekly, there may be little question as to whether or not

9   that in fact happened in that the legislature has deemed that

10  inappropriate under law, right?  That you should be paid weekly

11  and not bi-weekly in certain categories.  Then the question

12  would be, would the legislature create such a rule without

13  creating a remedy?

14        MR. HENNING:  Good question, Your Honor.  We think

15  that speaks to the division of "authority" is probably the word

16  I've been using.  We'll see if the Court agrees that's the right

17  one.  The legislature decided to give to two different folks.

18  One, on the one hand, employees or former employees.  And on the

19  other hand, the Labor Commissioner for the State of New York.

20        Our read of the statute, Your Honor, is that the New

21  York Legislature made the decision to give two employees or

22  former employees the ability to seek redress through Section 198

23  for "underpayment of wages."

24        THE COURT:  Okay.

25        MR. HENNING:  The authority the New York Legislature

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20      7

1  decided to give to the Commissioner is broader and is not

2  limited in the same way as it is limited to employees or former

3  employees.  So, to answer the Court's question more directly, we

4  don't think that an employer -- let me take a step back.

5  There's no allegation in this case that HPE, or Unisys, or any

6  Defendant is delaying forever and ever wage payment and only

7  paying them on the eve of litigation.  So, that's not the set of

8  facts we're alleged to be operating under here.  But should

9  there be employers who are behaving unscrupulously and up to no

10  good, and the marketplace can't handle that, our read of the

11  statute is, it is not the case that those employers are free to

12  create mischief around the state, but rather that is something

13  for the Labor Commissioner and not employees that are former

14  employees.  And we think --

15          THE COURT:  So, your suggestion, counsel -- let me

16  make sure I understand.  Your suggestion is that, if I'm a wage

17  earner who's not being paid properly in this respect, in the

18  respect alleged here, meaning bi-weekly instead of weekly, I'm

19  not without remedy, but my remedies are limited to an

20  administrative forum.  Is that fair?

21          MR. HENNING:  Or brought by remedies that could be

22  obtained/brought by the Commissioner, and then, of course, the

23  Commissioner has all sorts of authority to collect payments from

24  the employer and do with them what is appropriate vis-à-vis the

25  employees.  So, that sort of division of the world, Your Honor,

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20    8

1    is how we see the statute breaking.

2            Underpayment, the statute is very clear that employees

3    and former employees, certainly, have the right to seek redress

4    where there is an "underpayment".  And that's, admittedly, a

5    limited universe of places.  And the New York Legislature said,

6    for other things that are not underpayment, the Labor

7    Commissioner holds the hammer there.  And, Your Honor, we think

8    that our interpretation, our proposed interpretation of the

9    statute remains faithful to that language.  And to treat "late"

10   the same as "underpaid" or "paid less than an amount", which we

11   think are two different things, sort of ignores the division

12   that the New York Legislature decided to make between what

13   employees and former employees can do versus what should be left

14   to the Labor Commissioner.

15           THE COURT:  Given what's at issue in this case, given

16   how it breaks down in terms of the amount of damages and so

17   forth potentially, is it fair to say that although you have

18   another argument about wage notice, which I will hear from you

19   in a moment, that's sort of the tail wagging the dog.  Meaning

20   that this is the kind of issue that would govern largely what

21   happened in this case might be the kind of issue that would be

22   appropriate for an interlocutory appeal.  Am I right about that,

23   or no?

24           MR. HENNING:  I certainly agree with the Court that

25   this certainly appears to be the Plaintiff's primary claim,

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20      9

1    count one, and that the question of whether a claim even exists

2    when the allegations are late paid as opposed to underpaid is

3    certainly as critical question in the case.  I can't say I

4    thought a lot about the 1292 requirements, but there certainly

5    does appear to be, as we've acknowledged in our letter, there

6    does appear to be a difference in the caselaw, so there's a

7    difference of opinion on that.  And it seems to have the

8    potential to sort of greatly narrow or resolve the issues in the

9    case.  I'm speaking of a difference of opinion.

10             THE COURT:  Okay.

11             MR. HENNING:  The primary cases on the other side of

12   this, Your Honor, as Plaintiff cited in the letter, and we

13   previewed for the Court as well, are *Scott*, from the Eastern

14   District of New York, and *Vega* from the Appellate Division in

15   the State Court in the First Department.

16             THE COURT:  Right.

17             MR. HENNING:  And we think there are generally two

18   places those cases, those decisions, we think kind of run astray

19   from the language here.  In the ordinary usage of these terms,

20   there is a difference between being paid less than and the

21   amount you're supposed to be paid, and after a deadline.  And we

22   think that treating underpayment as late paid, it's just not

23   faithful to the language that the New York Legislature decided

24   to use.

25             The New York Legislature certainly understands what it

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   10

1    means to be paid late, and it certainly understands what it

2    means to be less than an employee is supposed to be paid.  And

3    they decided in Section 198 only to speak in terms of an

4    underpayment and not late paid.  In the most recent state or

5    Supreme Court cases, including Bostock and others, I think our

6    directions were, we should take the statutes as they come to us,

7    and take the decisions that were made by the legislature as they

8    exists.

9              The second piece of those cases --

10             THE COURT:  So, counsel, before you go to the second

11   issue, what I'll say about the first issue is, that's

12   fascinating.  And if your clients are on the line, I don't know

13   if you have corporate counsel on the line or not, but what I

14   would say about the fascinating issue is that's bad, because

15   that's expensive, right?  Fascinating costs money.  But

16   nevertheless, I'm fascinated, so thank you for that.  Let's jump

17   to your next argument, please.

18             MR. HENNING:  The next one, I think we can quickly

19   dispense with, Your Honor.  The Court in *Vega* actually goes to

20   the dictionary definition of underpaid.  But think we think the

21   result is not faithful to the definition it cites.  As the court

22   in *Vega* says, the definition of underpaid is less than.  And

23   again, in the ordinary usage of these terms, less than and late

24   are different things.

25             THE COURT:  Let me just make clear on the facts here

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   11

1    as alleged.  It was never a catch-up situation.  It wasn't like,

2    oh, you were sued and suddenly you paid them a bunch of money.

3    It was just that you always paid them bi-weekly, and that's the

4    lateness that we're talking about.  Yes?

5         MR. HENNING:  You're right.  The Court has correctly

6    captured the allegations in the complaint.  Exactly right.

7         THE COURT:  All right.  Counsel, your only point there

8    is, it's your belief these folks were hired too early in time to

9    qualify or the notice provisions.  Yes?

10         MR. HENNING:  Well, Your Honor, that is true as

11    against some Defendants.  You're right that the wage notice

12    claim does not apply to folks who were hired before, I believe,

13    it's April of 2011.  I suspect that's in part why count two is

14    only asserted against one Defendant, Hewlett Packard Enterprise

15    Company.  And on that issue, Your Honor, just ten seconds of

16    background.

17         The Plaintiffs worked for many years for an entity

18    called Hewlett Packard Company, the old HP as many of us

19    remember.  As of November 1, 2015, this is alleged in the

20    Plaintiff's complaint, Hewlett Packard Company split into two

21    different entities.  One of those entities was Hewlett Packard

22    Enterprise Company.  I think, Your Honor, I'm going to dumb down

23    the corporate transaction language here and my colleagues would

24    be upset with me if they heard me do it, but a spinoff

25    transaction of a business unit from old HP Co.  And then as the

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20    12

1   Plaintiffs alleged, they are correct, HP Inc., the rest of

2   Hewlett Packard Company, was renamed HP Inc.

3          And what happened, Your Honor, as part of that

4   transaction, these Plaintiffs moved over to Hewlett Package

5   Enterprise Company.  And so as against HPE, our argument is, the

6   statute requires the wage notice "at the time of hiring."  And

7   it is our read of the statute that these folks were not hired by

8   HPE within the meaning of the statute.  Instead, an entire

9   business unit was taken out of one company and stood up as its

10  own independent entity.

11         The complaint, Your Honor, the original complaint,

12  alleged that these folks, the Plaintiffs "moved from HP to HPE

13  and we think that's an accurate description of what happened.

14  The current complaint, the amended complaint changes that

15  description to say they were hired by HPE to match the element

16  of the wage-notice claim.  So, in the words of Iqbal and

17  Twombly, there are no factual differences.  The complaints don't

18  have any allegations of factual differences and how these folks

19  ended up at HPE.  And the language of hiring is, again in the

20  Iqbal and Twombly words, a recitation of the element of the

21  claim or a label or a conclusion.  These folks don't allege that

22  they ever lost employment or that there were breaks in services.

23  They were part of a business unit that was spun out and stood up

24  as its own independent entity.  And on those facts alleged, we

25  don't think that's a hiring, within the meaning wage notice.

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   13

1    THE COURT:  So, to correct my question then, I guess

2    your position is, these folks were all hired before, and there's

3    this sort of interesting hiccup about when there's a spinoff,

4    again, using the colloquial, a spinoff of an entity, does that

5    constitute a new hiring or not?  Do I have that about right?

6    MR. HENNING:  Yes, Your Honor.   That's right.

7    THE COURT:  Okay.  But there's one employee, one

8    plaintiff, who was just flat out hired after the relevant date?

9    MR. HENNING:  I don't think so, Your Honor.  I think

10   there is one who has had a different experience with Unisys.

11   After these folks moved to Hewlett Packard Enterprise, they then

12   moved to Unisys, and I'll let the Unisys folks talk to that, but

13   I think the distinction you may be hitting on is that one of

14   them has had a different experience at Unisys than the other

15   two.

16   THE COURT:  Right.  Interesting.  Interesting.  Well

17   done, counsel.  Thank you.  All right.  With that, let me switch

18   to counsel for Unisys.  What would you like to tell me today?

19   MR. RUZAL:  Thank you, Your Honor.  And this is Jeff

20   Ruzal from Epstein Becker.  I will be speaking on behalf of

21   Unisys today.  With not wanting to replicate what Mr. Hennig

22   just spoke, I'll try to supplement to conserve judicial

23   resources and everyone's time today.

24   To take it back, the sole claim against Unisys is the

25   191, frequency of payee claim.  So, we do not have the wage

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   14

1    notice clam, so we won't be speaking about that today.  And I

2    agree with Your Honor's characterization that this certainly is

3    an issue that could find itself in interlocutory appeal as it is

4    the sole issue with respect to Unisys.  I completely echo what

5    counsel for the HPE Defendants had iterated with respect to 198

6    not supporting a claim for liquidated damages in the absence of

7    an underpayment, i.e. nonpayment of wages, which was exactly the

8    case with respect to Unisys Corporation as well.

9            I'll point out in addition to the caselaw that counsel

10   had indicated in the Eastern District.  I believe there are two

11   additional cases that support that same notion, which are Encoli

12   and *Husain*.  And we likewise believe that the court in *Vega* was

13   not following the statutory intent insofar as claiming that or

14   stating, I should say rather, in the decision that, "the moment

15   that an employer fails to pay wages in compliance with 191-1.a.,

16   the employer pays less than what is required."  Liquidated

17   damages under Section 198.1-a are defined as equal to 100

18   percent of the total amount of wage found to be due.  Therefore,

19   if such wages had already been paid, there would be no basis for

20   there to be liquidated damages that are owed, which is why we

21   disagree strongly with *Vega*.  And that the large swath of

22   decisions in the Eastern District follows that position,

23   contrary to *Vega* with the sole decision, of course, in *Scott*,

24   which counsel had already discussed.

25           Interestingly, in *Scott*, it's our belief that this was

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   15

1   somewhat underdeveloped, respectfully, and for that reason

2   should be discounted.  There really was no analysis, what

3   linkage to 198 itself, or discussion in terms of how it should

4   be interpreted with respect to being an underpayment or not, but

5   rather, focused solely on the issue of whether or not there's a

6   public policy issue (indiscernible).  Which again, as Your Honor

7   pointed out, if an employer wanted to try to avoid the law and

8   not pay wages when they're owed under Section 191, and cross

9   one's fingers that there's never actually a lawsuit filed, and

10  they're getting the time value of not having to pay those wages

11  that are owed, that's one thing.  That's certainly not the case

12  with respect to Unisys, that they paid on a current bi-weekly

13  basis, which is to say, basically, all of the wages were

14  effectively paid within the seven-day requirement if we believe

15  that it was perhaps only limited overtime wages and perhaps

16  certain differential wages that had been paid in the following

17  pay period.  So, there was no blatant attempt here to go outside

18  the law itself.  And so, for those reasons, we just do not

19  believe that that statute provides for the relief that

20  Plaintiffs seek.  And that's out position, again, without being

21  too cumulative with respect to the frequency of pay claim.

22          THE COURT:  Okay.  Counsel, let me ask you a question

23  because you raised an issue with me about waiver.  That

24  Caccavale and Mangelli waived all claims.  My question on that

25  is this.  In a legal system that requires what we call "Cheeks

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   16

1    approval", where you come to court and we have all these issues

2    that we look at.  And even when you have counsel and you're

3    represented and there's an arm's length negotiation, the Court

4    still has to review the settlement for fairness, and non-

5    confidentiality, and all these different things.  My question

6    is, in that world, can we really rely on an employee exit waiver

7    to stop this case?  I'm not sure.

8              MR. RUZAL:  I think we can, Your Honor, on two points.

9    The first point is that, where there's a bona fide dispute over

10   actual wages that are owed, then, yes, that would be something

11   brought or materialized in a claim that, whether settled or

12   litigated, would have to be approved by a district court or an

13   employee for the U.S. Department of the Labor.  Here, there is

14   no underpayment of wages.  There are no wages that are owed, and

15   there's no bona fide dispute over whether wages are owed.

16             And secondly, and we point this out in our pre-motion

17   letter to Your Honor, the fact that there are these waivers and

18   the fact that there are arbitration agreements provides

19   specifically that, again, there really should not be any sort of

20   class claims that could be brought.  And I'll mention, as I'm

21   sure Your Honor noticed, that Mr. Pagano's letter concludes by

22   stating that Plaintiffs, Caccavale and Mangelli, are willing to

23   withdraw their claims against Unisys without prejudice because

24   of the fact that they have signed releases.

25             THE COURT:  Oh, okay.  I missed that detail.  That

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   17

1   makes it easier.  Interesting.  Okay.  Good.  Anything you want

2   to add, counsel?

3              MR. RUZAL:  No.  No.  I really wanted to also mention

4   the class certification piece in connection with Your Honor's

5   question.  The only other thing I'll say is that because there

6   are signed releases for a good number of individuals, we really

7   thing that any class would be severely terminally compromised

8   here.  And this is a fact that we had pointed out to counsel for

9   the Plaintiffs before this had been filed.  This is something

10  that had been at light for quite some time here.  Again,

11  understanding this a potential motion to dismiss, not in our

12  petition for class certification, but nonetheless, to try to

13  address this as early as possible for the sake of efficiency.

14  We just don't think a class is appropriate here.  Specially,

15  where two of the three named plaintiffs have signed releases.

16  Not to mention any of the other potential putative class

17  members.

18             THE COURT:  Right.  Okay.  Good.  Thank you.  All

19  right, Mr. Moser, over to you.  Now, counsel has said a lot.

20  And there's a lot to respond to.  But Mr. Moser, I know you

21  quite well, and I know you've never shied away from a challenge,

22  so I'll hand it over to you, sir, with that in mind.  Go ahead.

23             MR. MOSER:  Yes.  And before I begin, this is the

24  first time I'm appearing in front of you since December of last

25  year, and I'd like to extend my hardiest congratulations.

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   18

1        THE COURT:  Thank you.  And in case other counsel

2    don't know, I became an Article III Judge.  I was a magistrate

3    judge for many years, and I finally got confirmed in December of

4    last year.  So, thank you, Mr. Moser.  And what counsel, if they

5    haven't met you yet, should know is that you usually have an

6    impressive bowtie on when you go to court, and they should look

7    forward to that in the future when we're allowed to appear in

8    person again.

9        MR. MOSER:  Thank you.  Thank you.

10        THE COURT:  So, Mr. Moser, what do you want to say?

11    And let's focus on the 191, 195, 198 argument, please.

12        MR. MOSER:  Here, what the Defendants really want to

13    say is, look, we paid these people every two weeks.  We didn't

14    delay wages for a month or more.  These men were even expecting

15    to be paid on a bi-weekly basis, not on a weekly basis.  And

16    it's not like the schedule said that they were going to be paid

17    on the 15th, and they were only paid on the 21st.  So, I guess

18    the question from their perspective is, what is the justice in

19    allowing these employees to sue us for liquidated damages?  And

20    the answer is very simple, it may not seem fair, but this is a

21    court of law, and the law make what they did illegal.

22        And when we look at *Vega*, *Vega* is not a case out of

23    the Court of Appeals, but it is a case from an intermediate

24    state appellate court, and therefore, I'm quoting from a

25    decision of Judge Forestine, who actually addressed this issue.

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   19

1   And she quotes "*Cowan v. The City of Mt. Vernon*, which is out of

2   the Southern District, that in making the determination of how

3   the Court of Appeals would rule, the rulings of intermediate

4   state courts are entitled to persuasive, if not decisive

5   consideration."  And even the Second Circuit has said, in *Fieger*

6   *v. Pitney Bowes*, 251 F.3d 386, "The holding of an intermediate

7   appellate state court... is a datum for ascertaining state law

8   which is not to be disregarded by a federal court unless it is

9   convinced by other persuasive data that the highest court of the

10  state would decide otherwise."

11       And so, *Vega*, although, they disagree *Vega*, *Vega* is

12  the highest appellate decision specifically on point, and

13  therefore, it should be followed.  There's one other decision.

14  It's actually out of the court of appeals, which also is

15  interesting, and it indicates that the court of appeals would in

16  fact rule that there is a private right of action under 191.

17  And that case is *Bynog v Cipriani Group*, 1 N.Y.3d 193 (2003).

18  And in that particular case, the appellate division had found

19  that the plaintiffs were actually suing under New York 191 for

20  untimely payment of wages.  The appellate division found that

21  the plaintiffs were employees and reinstated a cause of action

22  under New York Labor Law § 191, which had been dismissed by the

23  trial court.

24       It went up to the Court of Appeals, and the Court of

25  Appeals concluded that the plaintiffs were independent

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   20

1    contractors, and on that basis alone, dismissed the cause of

2    action under New York Labor Law § 191.  But significantly,

3    neither the Second Department, nor the Court of Appeals

4    suggested that the plaintiffs did not have a right to bring a

5    claim under New York Labor Law § 191 in the first instance.  So,

6    it seems as if the Court of Appeals tacitly acknowledged in that

7    decision that yes, indeed, a private right of action exists

8    under New York Labor Law § 191, which is redressable under New

9    York Labor Law § 198.  So, again, those two decisions are

10   significant.

11          And with regard to the role of the federal courts in

12   applying New York State Law, this Court is better versed at it

13   than I am, but I understand that the goal is to ascertain how

14   the Court of Appeal would rule on the issue.  And when we look

15   at all of the cases that are on the record regarding 191, there

16   is only one judge who actually asked that question, and that is

17   Judge Feuerstein I *Scott v. Whole Foods Mkt. Grp., Inc.*  So,

18   when we look at persuasive authority, I think that that case is

19   the case that should be looked at because she's the only one

20   who's asked the relevant question.  And it all started with

21   *Husain v. Pakistan Airlines*, in which there's no analysis in

22   that case anywhere, and that particular district judge ruled, I

23   think it was Gorman, but I'm not sure; that there's no right of

24   action under 191 and 198.  But he did that in one sentence

25   without any analysis whatsoever, and it seems that that kind of

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   21

1    caught on.

2            I understand it's inconvenient for the Defendants what

3    I'm saying, but again, the state of the law is, at this point in

4    time, that a private right of action exists for late payment of

5    wages, and the state of the law is that the remedy is liquidated

6    damages.

7            I don't want to belabor the other issues with regard

8    to the releases.  Mr. Pagano already indicated we're not

9    interested in making more work for the Court if there's relief

10   on point.  I think that the distinguishing factor between this

11   case and *Cheeks* is that *Cheeks* involved FLSA review, and there's

12   no FLSA claims here.

13           THE COURT:  Good point.

14           MR. MOSER:  I don't know if I'm missing anything here.

15   Oh, with regard to the --

16           MR. PAGANO:  The hiring notice.

17           MR. MOSER: Oh, the hiring notice.  Thank you, Paul.

18   There is a question of fact, at the very least, as to whether

19   these individuals were hired by this other entity.

20           THE COURT:  Right.

21           MR. MOSER:  You know, they're receiving their

22   paychecks from a different company.  How is that not a hiring?

23           THE COURT:  Interesting.  Also, an interesting

24   question, although, very much a subsidiary one, in the sense

25   that the first thing you addressed is obviously, the guerrilla

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   22

1   in the room.  And that's the big thing.  So, we have to look at

2   that first, I think.

3           MR. MOSER:  Correct.

4           THE COURT:  So, let me just double-check.  You were

5   saying that the two Plaintiffs with the releases are willing to

6   withdraw their claims against Unisys.  So, that issue is out of

7   the case, yes?

8           MR. MOSER:  Correct.

9           THE COURT:  Okay.  So, we'll deem that ordered.  Based

10  on this transcript, we're done.  Understand, we're working under

11  very difficult circumstances, and I'm trying to move cases as

12  efficiently as possible dictated by Rule 1, with the recognition

13  that, of course, we're all facing a deadly pandemic and doing

14  our best.  So, let's at least move that piece today.  So, we've

15  got that.

16          I started this conference by reminding everyone of my

17  authority and my rule to deem it as the motion itself, and I

18  have not been shy about doing that in recent month because it's

19  very hard times for everybody.  But I have to say, the 191, 195,

20  198 issue, the issue about whether or not there's a remedy for

21  the late wages is fascinating to me and difficult and there's

22  not a clear answer.  I mean so many times, I get motions from

23  lawyers and you just say, well, the Second Circuit said this, so

24  we're done.  We don't have that here.

25          I commend counsel, obviously, for their work.

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   23

1   Everyone acknowledged that my colleague, Judge Feuerstein, delve

2   into this issue, and she came out one way.  And I'm not saying

3   I'm not persuaded by her work, but I haven't really thought

4   about this very long.  What I propose to do, and I'd love to

5   hear if counsel has any objection to this, I would love for you

6   all to brief that one issue.  In other words, I don't want to

7   put through extra expense, and we don't have to drag out

8   everything.  I think Plaintiff's counsel is right, at least,

9   whether there's a hiring or not, probably should await summary

10  judgment.  The wage notice thing is interesting, but again, it

11  turns on some facts that we might not have before us right now.

12  But what I would love to do is just ask you all to write a

13  brief.  And when I mean a brief, I use the word in every sense.

14          I don't need 500 pages.  It doesn't have to be

15  aspirational.  I don't set page limits, like everybody writes me

16  35 pages.  I don't need that.  But I would love you to be able

17  to fully brief the issue.  I could decide the issue; hold

18  everything else, other than what we've talked about today, in

19  abeyance, so we can get that decided.  And if this is the kind

20  of case you want to go with an interlocutory appeal and the 1292

21  factors are there, we can have that discussion once we've had a

22  chance to look at it.  Rather than proceed on class action

23  discovery and so forth.  Maybe this is a good way to do this.

24  But I would welcome the views of counsel on that procedure

25  before I put my stamp on it.  What do you think?

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   24

1          MR. HENNING:  Your Honor, this is Kris Henning --

2          MR. MOSER:  For the Plaintiffs --

3          MR. HENNING:  I'm sorry, go ahead.

4          MR. MOSER:  For the Plaintiffs, I'm fine with that,

5   from my perspective, in terms of just a brief.  And also, in

6   every sense of the word.

7          MR. HENNING:  And, Your Honor, this is Kris Henning,

8   for HP Inc and HPE, we don't have an objection to that path

9   forward with one clarifying question.  It sounded like the Court

10  envisioned simultaneous papers coming in from everyone at the

11  same time, rather than, put one in, and then respond to the

12  other side kind of path?

13         THE COURT:  Maybe it's easier to alternate, but I'll

14  leave that up to you.  It could be had either way on that

15  question.

16         MR. RUZAL:  And, Your Honor, for Unisys Corporation,

17  likewise, we have no objection.  We think that that makes good

18  sense.

19         THE COURT:  Okay.  So, let's do this.  Let's do a

20  traditional sort of brief, response and reply, just so you can

21  think in normal ways about this, and not anticipate things that

22  don't happen.  Understand, I do a pre-motion conference with the

23  hope of doing exactly what we did today, which is to focus your

24  efforts on things that matter in the big sense.  Everyone is

25  free to make any motion they want.  I'm not denying anyone.  I'm

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   25

1  not not hearing any arguments.  I actually heard you.  And I

2  should say that all counsels have done a fine job today.  And

3  one of the reasons why I'm interested to take on an issue like

4  this in a case like this is because I have good counsel on both

5  sides and I'm eager to take a look at your work and work on this

6  with you.  Particularly, if this will be interesting.  So, let

7  me ask Defendants first.  When would you like to get your briefs

8  in?  And gain, please, keep them short.  And if you need more

9  time to write a shorter brief, I'm happy with that.  Tell me how

10 much time you need.

11         MR. HENNING:  Your Honor, does something like three

12 weeks sound acceptable?

13         THE COURT:  If it's good for both of you, it's

14 wonderful for me.  Is everybody on board with that?

15         MR. RUZAL:  Unisys can make that work as well, Your.

16 Honor, yes.

17         THE COURT:  Excellent.  Mr. Moser, they're going to

18 take three weeks; they're going to send you briefs, and

19 hopefully short briefs, to the point, punctually, timely, and

20 nicely written.  How long would you like to respond to that, Mr.

21 Moser?

22         MR. MOSER:  I'd like three weeks to respond.

23         THE COURT:  That sounds perfectly, just and equitable.

24 That's amazing.  Perfect.  Three weeks and three weeks.  And

25 then a week for a reply from Defendants?  Then again, a reply,

Caccavale et al v. Hewlett-Packard Company et al - 7/15/20   26

1   you don't even have to submit one if you don't think you need

2   it.  Fair enough.

3          MR. HENNING:  Sounds fine, Your Honor.

4          MR. RUZAL:  Sure.  Yes, Your Honor.

5          THE COURT:  All right.  So, we have a schedule.  We

6   have a plan.  We're going to focus on the big issue I the case.

7   And then, is there anything else I need to do while have you

8   all?  And by the way, the record should reflect officially we've

9   withdrawn those claims that were released.  So, you don't have

10  to worry about those, which is good.  We've made some progress

11  today.  Anything else I need to do while I have you all

12  together?

13         MR. MOSER:  Not from the Plaintiff's perspective, Your

14  Honor.  Thank you.

15         THE COURT:  All right.

16         MR. HENNING:  And none from us as well, Your Honor.

17         MR. RUZAL:  And none from Unisys either, Your Honor.

18         THE COURT:  Excellent. All right.  In that event,

19  I'll let you all go and get to work.  Please wash your hands.

20  and wear a mask, and stay well because these are tough times.

21  But I look forward to getting your briefs, counsel.  All right?

22         ALL COUNSEL:  Thank you, Your Honor.

23         THE COURT:  Okay.  We are adjourned.  Be well.

24                      - o0o -

25

1                              CERTIFICATION

2

3          I, Rochelle V. Grant, certify that the foregoing is a

4   correct transcript from the official electronic sound recording

5   of the proceedings in the above-entitled matter.

6

7   Dated:  August 31, 2020

8

9                          _____

10                              Rochelle V. Grant

11                          AA Express Transcripts
                                (888) 456-9716

12

13

14

15

16

17

18

19

20

21

22

23

24

25